# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2468

_____

Heartland Bank,      *

        *

       Plaintiff-Appellant,     *

        *    Appeal from the United States

      v.               *    District Court for the Eastern

        *    District of Missouri.

Heartland Home Finance, Inc.,     *

        *

       Defendant-Appellee.     *

_____

Submitted: January 16, 2003

Filed: July 17, 2003

_____

Before HANSEN,[*] Chief Judge, BRIGHT, and SMITH, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Heartland Bank ("Bank") brought a five-count complaint against Heartland Home Finance, Inc. ("HHF") alleging unfair competition under the Lanham Act, common law trade name and service mark infringement, service mark infringement and mark dilution under Missouri state law, and common law unfair competition. The district court granted several of HHF's motions to exclude certain evidence and

_____

[*]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

testimony. At the conclusion of the Bank's case, the district court granted HHF's motion for judgment as a matter of law because the Bank failed to adduce sufficient evidence of secondary meaning and likelihood of confusion.

The Bank appealed the judgment of the district court. We vacate the judgment and remand for further proceedings and possible alternative sanctions consistent with this opinion.

I.    BACKGROUND

The Bank was founded in 1887 under the name Economy Federal. It adopted the name Heartland Bank in 1987. Since that time it has used the name continuously for banking services, including consumer deposits, business loans, checking accounts, and originating and refinancing single family mortgages. In 1994, the Bank registered its Heartland mark with the state of Missouri. In the same year, the Bank began using the mark, "Heartland Mortgage," and registered that mark with the state in 1998. Both marks are used in conjunction with the Bank's characteristic wheat emblem.

HHF is an Illinois corporation in the mortgage lending service business. HHF has used the word Heartland in its name since its formation in 1987. Initially, HHF operated in Illinois and Ohio. Today HHF does business in twenty-five states and almost exclusively telemarkets its services. In February 1998, HHF established an office in Missouri and began offering mortgage financing services in St. Louis under its name, Heartland Home Finance. HHF asserts that it has never used the name Heartland Mortgage Company in Missouri, but it uses that name in Illinois. HHF's mark also features a wheat emblem.

According to the Bank, it initiated this action after receiving a series of phone calls from individuals complaining to the Bank about HHF's rude telemarketing and other conduct. The Bank does not engage in telemarketing.

At the inception of this dispute, the Bank's outside counsel recognized that evidence of consumer confusion would be advantageous in the litigation. First, the Bank hired Henry D. Ostberg to conduct a survey to determine the likelihood of confusion between the Bank and HHF. The trial court eventually excluded this evidence at trial because the Bank failed to make a timely disclosure of their expert reports pursuant to the court's case management order. Second, the outside counsel drafted a form entitled, "Name Confusion Incident Log," and instructed Bank personnel to complete the form for each call or inquiry where the person believes that the Bank and HHF are related or the person is otherwise confused by the similarity of the entities' names.

Bank counsel obtained the results of this form from Bank personnel. During discovery, the Bank responded to HHF's request that the Bank state all alleged instances of confusion by asserting attorney-client and work product privileges to protect the logs from discovery. Instead of providing the actual forms, affidavits, and other items that documented the instances of confusion, the Bank created summaries and presented those to HHF in documents called, Incidents of Actual Confusion and Supplemental Incidents of Actual Confusion (collectively "Confusion Log Summaries").

The parties scheduled depositions to occur before the discovery deadline of October 31, 2000. But before the depositions began, the parties' representatives tentatively agreed to resolve the case through settlement, and the depositions were cancelled. From October through early December, the parties exchanged draft settlement memoranda.

On April 13, 2001, just three days before the trial date of April 16, 2001, the Bank unilaterally informed the district court that the parties were finalizing settlement and asked that the trial date be stricken. The court entered an order canceling the trial date and ordering the Bank to provide it with settlement papers by May 13, 2001, or face dismissal. On May 11, 2001, the Bank moved the district court to enforce the settlement agreement.[1] The district court denied this motion on January 11, 2002, and set a trial date of March 25, 2002.

On February 20, 2002, the Bank moved to reopen discovery. The court denied this motion and refused to extend discovery. The court noted that discovery certainly was foreclosed by April 13, 2001, when the Bank asked the court to vacate the impending trial date, and did not request an extension of discovery at that point.

On March 5, 2002, twenty days prior to the trial date, the Bank turned over its trial exhibits to HHF. This pretrial disclosure included the Name Confusion Incident Log forms, witness statements, affidavits, and other documents that the Bank had not previously disclosed, but which formed the basis of its Confusion Log Summaries.[2] When HHF received this evidence, it compared the underlying documents with the Confusion Log Summaries and arrived at the conclusion that the Bank had misled HHF and committed fraud on the court because the underlying documents did not support Confusion Log Summaries. On this basis, HHF made the following motion which it served on the trial date of March 25, 2002: Defendant's Motion to Bar Plaintiff's Evidence of Alleged Incidents of Actual Confusion, Strike Plaintiff's Pleadings, Enter Judgment Against Plaintiff and Award Defendant Attorneys' Fees and Costs.

---

[1]The parties vehemently dispute the facts surrounding the settlement process, but those disputes are not material to the issues of this appeal.

[2]These materials were included with about 250 exhibits.

In this motion the defendant described the conduct of plaintiff and plaintiff's counsel as "the perpetration of a fraud upon HHF and the Court" which "offend[s] the most basic notions of fair play and justice."

On March 27, 2002, the first day of trial, the court considered HHF's motion to exclude the Confusion Log Summaries, the underlying documents, and testimony from any witnesses connected to these items. In each of the summaries, which consisted of twenty-seven entries, the discovery response in essence asserted that the persons contacting the Bank complained of rude treatment from HHF which the recipient of the treatment mistook to be the Bank. However, the actual reports examined by the court revealed that the reporting person, with one exception, stated that the contact or call came from "Heartland Mortgage." The reporting individuals did not use the name "Heartland Home Finance," nor could each one of the entries necessarily be attributed to HHF.

At the time of the calls, a company not affiliated with either party operated in St. Louis under the name of Hartland Mortgage Centers (spelled without the "e"). Moreover, HHF operates as Heartland Mortgage only in Illinois. At no time has plaintiff definitively established that each entry in the Confusion Log Summaries is directly attributable to HHF. At most, that would only be a possibility. Obviously, what happened is that plaintiff's attorneys put their own spin on the log, and the spin has not been substantiated.

The trial court discussed the following incidents with counsel when she considered HHF's motion to exclude:

(1) Item 3 in the summary stated: "Unidentified female caller complained about rude treatment by Heartland Home Finance which she mistook to be the Heartland Bank." In fact, proposed Trial Exhibit 91 disclosed that the caller stated only that she had received a call from Heartland Mortgage.

-5-

(2) Item 5, Marge Dodta, the summary and the proposed Trial Exhibit 87 were essentially the same as Item 3 above.

(3) Item 7 in the summary stated: "Ms. Stefan complained about rude treatment by Heartland Home Finance which he (sic) mistook to be Heartland Bank." In fact, proposed Trial Exhibit 89 shows that Ms. Stefan actually complained about "Heartland Mortgage." After the bank employee taking the call informed Ms. Stefan about possible confusion, Ms. Stefan "called back after she found Heartland Mortgage Centers on Lind [illegible] Ave."

(4) Item 4, Eileen Sellers, in the summary stated: "Ms. Sellers complained about rude treatment by Heartland Home Finance which she mistook to be Heartland Bank." The Bank's proposed Trial Exhibit 86 showed that Ms. Sellers received a call from "Heartland Mortgage." Proposed Trial Exhibit 94, a statement taken by the Bank, reveals that Ms. Sellers tried to trace the telemarketing call she received from an individual named "Joe Schnell." After that was unsuccessful, Ms. Sellers and her husband "resorted to the phone book." They looked in the phone book and saw, "Heartland Mortgage," the mortgage division of the Bank. Upon calling the Bank, a Bank informed Ms. Sellers of the existence of HHF. Ms. Sellers then "looked in the phone book and contacted Heartland Home Finance." Ms. Sellers spoke to a manager who confirmed that Joe Schnell was an employee.

Item 4 is the only entry in the Confusion Log Summaries where the alleged rude call is shown to have emanated from HHF. However, it is not clear that Ms. Sellers associated that call with the Bank. She called the Bank only in an effort to trace the call.

In sum, the court examined four of twenty-seven items, and three clearly served to mislead HHF. The trial court ruled that the Bank should have produced the underlying documents "at least as early as January" 2002, when the motion to enforce settlement was denied, and the Bank's nondisclosure of the documents until twenty days before trial was inexcusable. Additionally, the court found that the Bank's Confusion Log Summaries were "clearly misleading" because many of the log forms

did not reflect that the caller actually said "Heartland Home Finance." The Confusion Log Summaries were based on the Bank's assumption about why people were confused "rather than accurately reflecting what the documents say and what the callers actually said." Rejecting HHF's request that judgment be entered against the Bank, the court instead excluded the actual logs as evidence at trial and precluded the Bank from offering the testimony of nine third-party witnesses and two Bank employees.

During the discussion before the court, the district court judge made the following comments and rulings. The court asked about prejudice and counsel for HHF replied:

> MR. DEE: They have the wrong company, Your Honor. They're suing the wrong parties here. We have gone through two-and-a-half years and spent too much of my client's money fighting a case that is against the wrong company.
> They knew it was against the wrong company. They hid the facts that it was against the wrong company. They can't get around the fact that when the caller said, "Heartland Mortgage," they told us -- the caller said, "Heartland Home Finance."
> If they had told us that the caller said, "Heartland Mortgage," the case would be completely different. This entire case is based upon the fact they claim that all these callers said, "Heartland Home Finance," and they said, "Heartland Mortgage."

(Tr. at 27).

The court viewed counsel's action in discovery as highly improper, stating, "[T]he purpose of this summary is not to reflect what your logic is but to reflect what the documents say and to do so accurately." (Tr. at 30). The court added:

-7-

Now, they did receive these summaries which were clearly inaccurate and represented essentially the plaintiff's assumption about what people were saying, rather than accurately reflecting what the documents say and what the callers actually said. That's misleading.

. . . .

And because they don't accurately reflect what was said by these callers, they don't even accurately reflect what was reported by your employees who took these calls. And they're misleading. Clearly misleading.

(Tr. at 35-36).

The court made an oral determination on the sanctions issue stating:

Now, I think that the defendant is correct that some sanction is appropriate in this case. I don't believe that a sanction in the form of a judgment is the appropriate remedy, because there are lesser remedies that I think will address the issue and address the plaintiff's misconduct short of depriving the plaintiff of any opportunity to pursue relief in the case.

I don't know whether either of you has anything further to say on the issue of sanctions. But, clearly, I will grant the defendant leave to submit a verified statement of the attorney's fees that it has incurred in connection with presenting this motion to the Court; and I will make a determination about a reasonable award of attorney's fees and costs to be assessed to the defendant and against the plaintiff in this case.

As far as these documents are concerned, the documents that appear under Tab H and any testimony relating to the portion contained in those documents, I am not going to let you present that. So if you have witnesses who you were going to call to talk about these reports of actual confusion that are reflected in Exhibit H, I am not going to permit you to present that testimony, nor will you be permitted to present any evidence on that issue.

(Tr. at 36-37).

Thereafter, the case proceeded to trial before a jury. The Bank's case took four hours; it called five witnesses and offered eleven exhibits into evidence. One of the Bank's witnesses, Bryan Morak, a former HHF employee, was not allowed to testify that he believed he had been working for the Bank when he was working for HHF. The trial court prohibited this line of testimony because the Bank failed to notify HHF of Morak's potential testimony in advance of the trial.

At the close of the Bank's case, the trial court granted HHF's motion for judgment as a matter of law based on the Bank's failure to establish secondary meaning in its marks or a likelihood of confusion. On secondary meaning, the court held that the Bank had established: (1) it had used the name "Heartland" continuously since 1987; (2) it had made considerable efforts to advertise its name and generate good will in the community; (3) it had expanded its operations throughout the St. Louis metropolitan area since 1987. However, the Bank failed to prove that "its mark has become associated in the mind of the public as identifying the source of goods or services." The district court acknowledged that there are "a number of ways that [secondary meaning] can be proved" but the Bank adduced no evidence of any "association customers make between the mark and the bank." In regard to proving actual confusion, the district court concluded that the Bank's only evidence of confusion was that Bryan Morak's mother mistakenly believed that her son was employed by the Bank when in fact he was employed by HHF. The court determined that it was clear Mrs. Morak was confused, but there was no evidence about what precisely prompted her confusion. Ultimately, the court stated, "So I guess that the bottom line is that this lack of any evidence on the issue of secondary meaning is, in my view, fatal to the plaintiff's case."

The Bank's motion for reconsideration was denied and the district court entered judgment for HHF on March 28, 2002. This appeal followed.

II.    DISCUSSION

A.    Exclusion of Actual Confusion Evidence and Testimony

We review sanctions imposed under either Rule 37 of the Federal Rules of Civil Procedure or the inherent power of the district court for abuse of discretion. Martin v. DaimlerChrysler Corp., 251 F.3d 691, 694 (8th Cir. 2001). We have characterized this review as "very deferential" and stressed that we "will not interfere with the great latitude exercised by the district court in discovery matters." Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 280 (8th Cir. 1995). Our duty is to scrutinize not just the conclusion reached by the district court, but "to examine with care and respect the process that led up to it." Bonds v. District of Columbia, 93 F.3d 801, 804 (D.C. Cir. 1996) (quoting Founding Church of Scientology v. Webster, 802 F.2d 1448, 1457 (D.C. Cir. 1986)).

In arriving at its sanctions decision, the district court explained the nature of the Bank's misconduct: (1) "these documents were not timely disclosed"; and (2) "the information summarizing these documents was misleading at the time that it was presented to the defendant." (Tr. at 38). We will examine both of these grounds for exclusion in turn.

i.    Untimely Disclosure

The Bank repeatedly tries to shift the blame for its nondisclosure by arguing that HHF never requested the underlying documents. However, in July 2000, during discovery, HHF requested "[a]ll documents and things evidencing or reflecting any actual confusion, deception, or mistake arising out of the use of any mark by any party." In its Reply Brief, the Bank clarifies its argument to indicate that HHF should have asked for the underlying documents again after the trial court denied the motion to enforce settlement. The district court appropriately rejected this line of reasoning.

-10-

The Bank was under a continuing obligation to disclose its evidence once HHF initially requested it.

Similarly, we reject the Bank's contentions that once settlement discussions started and the depositions were cancelled, it was under no obligation to disclose, and that the documents underlying its Confusion Log Summaries were privileged. The Bank had withdrawn any claims of privilege by October 2000, and the Bank's continuing obligation required that it produce any nonprivileged documents it possessed if it wanted to introduce them at trial.

The district court did not err in determining that the Bank's untimely disclosure entitled HHF to some type of remedy in the form of a sanction. We examine the extent of the court's imposed sanction below.

### ii.    Misleading Disclosure

The district court's second ground for excluding the Bank's Confusion Log Summaries evidence and testimony was that the Bank's initial disclosure to HHF in the form of the Confusion Log Summaries had been misleading. The court offered its reasoning on the second prong as, "these summaries which were clearly inaccurate and represented essentially the plaintiff's assumption about what people were saying, rather than accurately reflecting what the documents say and what the callers actually said. That's misleading." (Tr. at 35). Moreover, as we have observed, the district court correctly explained, "[T]he purpose of this summary is not to reflect what your logic is but to reflect what the documents say and to do so accurately." (Tr. at 30).

In its briefs to this court, the Bank attempts to defend its Confusion Log Summaries by characterizing them as "perfectly proper interpretive advocacy" and the result of a "logical deduction." Although it never explicitly makes this argument or offers any case law in support, the Bank also seems to contend that its Confusion

Log Summaries are not misleading because they are only allegations of confusion. We fail to understand how a misleading allegation of an instance of actual confusion differs from a misleading actual instance of confusion, or why it would be proper for the Bank to mislead HHF in regard to allegations. These arguments are frivolous and unworthy of advocacy.

We do not have the luxury of a written order in this case and so we cannot be certain about the extent of the district court's examination of the Bank's Confusion Log disclosure. A review of the record reveals the materials the district court had before it while ruling on the sanctions motion: HHF's motion with an attached chart comparing the Confusion Log Summaries with the underlying original documents the Bank sought to have admitted into evidence as trial exhibits; the Confusion Log Summaries; and all the underlying original documents. However, the trial transcript indicates that the court explicitly discussed only four of the twenty-seven entries with the parties and three were clearly misleading. Naturally, the transcript does not reveal whether the court considered the comparison chart prior to trial or at some other point prior to ruling.

Based on this record, we cannot be certain that the district court considered each recorded instance of confusion individually and assessed whether or not it was misleading. It appears that the court judged the Confusion Log Summaries in their entirety and excluded witnesses and evidence based on a somewhat limited review.

Moreover, the actual prejudice for the trial may be in question. Defendant's principal complaint seems to be that it has spent more than two years in litigation without having the true facts underlying the plaintiff's complaint, and now having the true facts, the complaint is unfounded. The waste of litigation time can be compensated by appropriate monetary sanctions. Whether the so-called contacts to various persons came from HHF remains an open question. It may well be that plaintiff cannot show any confusion with the twenty-seven items contained in its

disclosures. In that circumstance its action will fail, but it is entitled to trial on the merits.

### iii.    Appropriateness of Sanctions Imposed

We are loath to reverse a district court's sanction in the face of such clearly obstructionist conduct on the part of plaintiff and its attorneys. Nonetheless, the record does not substantiate the breadth of the sanction imposed by the district court.

The court did consider some alternative sanctions: "I don't believe that a sanction in the form of a judgment is the appropriate remedy, because there are lesser remedies that I think will address the issue and address the plaintiff's misconduct short of depriving the plaintiff of any opportunity to pursue relief in this case." (Tr. at 36). However, the district court's decision to exclude the Bank's nine third-party witnesses and two Bank employees from testifying was tantamount to a dismissal of its claims. Without the excluded evidence, the Bank could not show any case on confusion. The district court should have considered the possibility of lesser sanctions, perhaps excluding only certain items of evidence from the Confusion Log Summaries, granting HHF a continuance, and/or imposing monetary sanctions relating to abuse of discovery upon plaintiff's counsel and upon the plaintiff.

## III.    CONCLUSION

We remand on the threshold matter of striking all the proposed witness testimony on confusion and remand for reconsideration of all the alleged discovery abuses by plaintiff and counsel, and for consideration of whether the late disclosure

prejudiced defendant's ability to defend considering all of the matters disclosed. We need not address any other claims raised by the Bank.[3]

We vacate the judgment and remand for further consideration of the sanctions consistent with this opinion and the entry of an appropriate order. No costs are awarded on this appeal.

SMITH, Circuit Judge, with whom HANSEN, Circuit Judge, joins, concurring.

I concur with the majority opinion, but I write separately to address an issue arising from the district court's grant of judgment as a matter of law to HHF. Because we have vacated the district court's decision and remanded for further proceedings, I write to clarify our precedents involving the type of evidence that can be used in a trademark case.

On appeal, the Bank raised two issues in addition to the discovery sanctions. The Bank appealed the district court's judgment as a matter of law on the issues of 1) whether the Bank's trademark was inherently distinctive or that the Bank made a submissible case of secondary meaning, and 2) whether the court erred in holding that evidence of actual confusion and survey evidence are necessary to create a submissible case on likelihood of confusion. Principally, the Bank challenges the district court's application of the law concerning the type of evidence needed to establish secondary meaning and likelihood of confusion.

---

[3]I do not join in the separate concurrence of Judge Smith, joined by Judge Hansen. The record on remand may well be different than the record on this appeal. Thus, I believe it is unnecessary at this time to address the matters commented upon in the separate concurrence.

## 1. *Secondary Meaning or Inherent Distinctiveness*

The district court granted HHF's oral motion for judgment as a matter of law after stating in relevant part:

> I think there is no dispute between the parties as to the plaintiff's obligation to establish secondary meaning as an element of its claim. And in this regard, the plaintiff has to establish or prove that its mark has become associated in the mind of the public as identifying the source of goods or services. And that is basically the essence of establish secondary meaning. There are a number of ways that that can be proved; however, the plaintiff has not proved that the mark has become associated in the mind of the public with services provided by the bank or has associated it with Heartland Bank.
>
> There's been no evidence as to the effect that all of this advertising has had on customers or potential customers of the bank or potential consumers of the bank's products. There has been no evidence that of any association that customers make between the mark and the bank. And on the issue of actual confusion, we've talked about that at some length already, the only evidence of any confusion at all comes from the testimony of the witnesses regarding Mrs. Morak, who apparently, mistakenly believed that her son was employed by Heartland Bank when in fact he was employed by Heartland Home Finance.

Although the district court recognized that "there are a number of ways" that secondary meaning and likelihood of confusion can be proven, it concluded that the Bank's failure to provide consumer studies alone to be fatal to its claim. The court's analysis gave no consideration to evidence such as the extent of its advertising campaign, length of use in the market, and the money spent to promote the mark. The district court's decision is thus out-of-line with relevant precedent and persuasive authorities.

On remand, if the district court determines that the trademark is not inherently distinctive, then the court must consider whether the name "Heartland Bank" has acquired secondary meaning. In order to establish secondary meaning, the user of a mark must show that by long and exclusive use in the sale of the goods or services, the mark has become so associated in the public mind with such goods or services that the mark serves to identify the source of the goods and to distinguish them from those of others. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir.1994); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir.1985). In determining whether there is secondary meaning, "the chief inquiry is whether in the consumer's mind the mark has become associated with a particular source." *Aromatique, Inc.*, 28 F.3d at 871; *Co-Rect Products, Inc.*, 780 F.2d at 1332-33.

Generally, consumer surveys and testimony of consumers may be the only *direct evidence* of secondary meaning and should be considered in determining whether a mark has acquired such meaning. *Co-rect Products, Inc.*, 780 F.2d at 1333 n. 9 (emphasis added). However, if such direct evidence is absent, the court must consider whether secondary meaning can be inferred from the indirect evidence presented. *Aromatique, Inc.*, 28 F.3d at 871.

Direct or indirect evidence can be used to establish secondary meaning, or "acquired distinctiveness." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Sections 15:30, 15:61, 15:66 and 15:70 (4th ed. 1999); *see also*, *In re Ennco Display Systems Inc.*, 56 U.S.P.Q.2d 1279, 1283 (2000). Direct evidence includes testimony, declarations, or surveys of consumers as to their state of mind. *Id*. Circumstantial evidence is evidence from which consumer association might be inferred, such as years of use, extensive amount of sales and advertising, and any additional evidence showing wide exposure of the mark to consumers. *Id*.

*McCarthy* further discusses the type of evidence that can establish a claim of secondary meaning, stating:

> Some courts have given broad hints that when plaintiff has a less than clear case, a survey is necessary to prove secondary meaning. However, survey data is not a requirement and secondary meaning can be, and most often is, proven by circumstantial evidence. The other traditional manner of proving secondary meaning is by circumstantial evidence of the seller's efforts in advertising the mark throughout a wide group of prospective buyers. Such circumstantial evidence can consist of evidence of the size of the seller, the number of actual sales made, large amounts spent in promotion and advertising, the scope of publicity given the mark, and any similar evidence showing wide exposure of the buyer class to the mark in question.

*McCarthy*, § 15.30. In addition, *McCarthy* notes that courts usually consider the following factors in determining whether a term has acquired secondary meaning:

> Direct Evidence:
> 1. Direct consumer testimony
> 2. Consumer survey
> Circumstantial Evidence:
> 1. Exclusivity, length and manner of use
> 2. Amount and manner of advertising
> 3. Amount of sales and number of customers
> 4. Established place in the market
> 5. Proof of intentional copying

*Id. Accord*, *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1352 (Fed. Cir. 1999) (noting that 15 U.S.C.A. § 1052(f) indicates that it is prima facie evidence of distinctiveness if trademark used exclusively and continuously for five years); *Stuart Hall Company, Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995); *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791, 793 (9th Cir. 1982).

In any case, circumstantial evidence can be sufficient to meet a party's burden of proof to establish a claim. In fact, in a trademark case, circumstantial evidence may be all that is available to establish secondary meaning. "Direct proof of secondary meaning is difficult to obtain." *Burke-Parsons-Bowlby Corporation v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989). Various circuits and authorities recognize that in the absence of direct proof, the court must draw reasonable inferences from the evidence of money spent in advertising to establish that the mark is from a particular source, of the type of advertising used, of long-term usage of the mark, and of sales volume. *Id.*; *President & Trustees of Colby College v. Colby College–New Hampshire*, 508 F.2d 804 (1st Cir. 1975) (normal consequences of substantial publicity may be inferred); *Reader's Digest Association v. Conservative Digest*, 821 F.2d 800 (D.C. Cir. 1987) ("... to say that proof of extensive advertising and substantial sales may not be probative of secondary meaning is to defy both logic and common sense."), *abrogated on a ground not relevant to this case*, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Yamaha International Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572 (Fed. Cir. 1988) (no obligation to introduce survey evidence to establish secondary meaning); *Echo Travel, Inc. v. Travel Associates, Inc.*, 870 F.2d 1264 (7th Cir. 1989) (court evaluated "*McCarthy*" circumstantial evidence factors to evaluate existence of secondary meaning in absence of consumer survey evidence or evidence of intentional copying).

In *Co-Rect Products, Inc.*, we recognized that various forms of evidence could establish secondary meaning so long as the evidence showed that the mark "through long an exclusive use and advertising" had "become so associated in the public mind" with a particular source. 780 F.2d at 1332. We acknowledged that the effect of, and not the extent of, advertising is the controlling inquiry, and to be effective, the advertising must cause the public to equate the mark with the product's source. *Id*. Although the court did not find secondary meaning based on the particular advertising efforts in that case, the court did not preclude a finding of secondary meaning without consumer survey evidence. Rather, the court noted that consumer

-18-

surveys, if available, would be considered as an additional factor, rather than the only or main factor, in determining whether a mark has acquired secondary meaning. *Id.* at 1333 n. 9; *see also*, *Truck Equipment Service Company v. Fruehauf Corporation*, 536 F.2d 1210 (8th Cir. 1976) (district court properly relied on both direct consumer testimony and circumstantial evidence of design copying to find trademark infringement); *Anheuser-Busch Inc. v. Stroh Brewery Company*, 750 F.2d 631 (8th Cir. 1984) (survey evidence helpful in gauging public reaction).

The district court acknowledged that the Bank presented circumstantial evidence that it had continuously used the name "Heartland Bank" since 1987; that it had expended considerable amounts of money and personnel to publish and advertise the name "Heartland Bank" and to generate good will in the community through various charitable activities; that it had spent approximately five-million dollars or more for several years on advertising and marketing to promote the Bank's name and product; that it has grown and expanded since 1987 throughout the St. Louis metropolitan area; and that it had "promoted itself as an entity that provides individualized service and personal service to customers" since the 19th Century. However, the district court discounted this evidence by determining that the Bank did not connect this circumstantial evidence to an impact it may have had on consumers and failed to provide any direct consumer testimony of that impact. As such, the district court failed to consider the circumstantial evidence on its own merits, and instead determined that the circumstantial evidence had to be tied to "impact" evidence of the type noted as "direct evidence" for the Bank to establish a case of secondary meaning. Clearly, this is not required. To require that level of proof would eliminate the use of circumstantial evidence to establish a case through reasonable inferences in this one area of law.

## 2. *Likelihood of Confusion*

The Bank also argues that the court erred in refusing to submit to the jury the issue of likelihood of confusion by holding that evidence of actual confusion and survey evidence were necessary in the case. The district court stated:

> And there's no evidence of any likelihood of confusion. There has been no evidence that the plaintiff partook or undertook any studies or consumer surveys to determine whether the public has any confusion or is likely to be confused by the similarity of the names of the two companies.
>
> My recollection from our discussion on one of the motions in limine yesterday was that there was no evidence that the plaintiff could produce on that point; that is, the plaintiff did not do any consumer studies. And there were no reports of any such studies that were conducted.
>
> So all we have is evidence of two companies that both are involved in the financial industry – the mortgage industry – and both of whom use the name the word, "Heartland," in their names. And they both do business in a similar geographical area, but that evidence alone is not enough to establish a trademark infringement or service mark infringement under state or federal law.

Likelihood of confusion, like secondary meaning, can be established through either direct or circumstantial evidence. In *Co-Rect Prods., Inc.*, we established that the following six factors are to be considered in determining whether a likelihood of confusion exists: (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the owner; (5) incidents of actual confusion; and (6) the type of product, its costs, and conditions of purchase. *See also Insty\*Bit, Inc. v. Poly-Tech Industries,*

*Inc.*, 95 F.3d 663, 667 (8th Cir. 1996); *Deluth News-Tribune v. Mesabi Publishing Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 774 (8th Cir. 1994). These factors, however, do not operate in a mathematically precise formula; instead, the relative weight of the factors depends on the facts of the individual case. *First National Bank, In Sioux Falls v. First National Bank, South Dakota*, 153 F.3d 885, 888 (8th Cir. 1998).

*McCarthy* notes that there are at least three evidentiary routes to prove a likelihood of confusion–survey evidence, evidence of actual confusion, and/or argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace. *McCarthy*, § 23:63.

> Under the third route, it would not be necessary for any witness to testify as to instances of actual confusion, for evidence of actual confusion is not necessary to prove a likelihood or probability of confusion. Thus, the decision-maker can decide the issue by inspection of the conflicting marks and their manner of use. As previously discussed, this is not a subjective judgment as to whether the judge, jury or Trademark Examiner would personally be confused, but rather, whether the ordinary, prudent customer in the marketplace would likely be confused. As Professor Perlman points out, in trademark litigation the persons whose states of mind are in issue are not parties to the case:
>
> Trademark infringement turns on proof of the likely state of mind of a class of persons -- consumers -- in a particular context -- when they are considering the purchase of goods or services. None of the relevant class is a party to the lawsuit. Consequently, there is no specific event or action to be proved by direct evidence; the likelihood that purchasers will be confused must ultimately rest on the inference to be drawn from circumstantial evidence.

*Id.*

Despite the presence of these forms of evidence, the district court relied only on the lack of direct evidence such as consumer surveys and did not focus on the mark itself. The court's exclusive use of direct evidence was improper considering the test used by this and other circuits to determine whether likelihood of confusion exists based on the evidence presented. Such evidence as that discounted by the district court – i.e., use of the same name, operating in same geographical area, etc. – may be sufficient when analyzed under the test factors noted, for example, in *Insty\*Bit, Inc.*, *Deluth News-Tribune*, *Anheuser-Busch, Inc.*, and *First National Bank, Sioux Falls*. Here, however, the district court did not analyze the evidence under these factors. As such, on remand it will be necessary for the district court to evaluate both the direct and circumstantial evidence offered by the Bank with the understanding that circumstantial evidence alone can be sufficient to establish the elements of secondary meaning and likelihood of confusion in a claim for trademark infringement.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.