# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2764

_____

Peter B. Dunning, for himself and as    *
representative and attorney-in-fact    *
for his grandchildren; David B.    *
Dunning; Claire Baker, Rachael    *
Baker; Timothy Baker; Meghan E.    *
Dunning; Charles B. Dunning;    *
Bailey W. Dunning; Corey Steven    *
Sheehan; Hazel R. Dunning,    *
   *
   *   Appeal from the United States
      Plaintiffs-Appellants,    *   District Court for the Southern
   *   District of Iowa.
      v.    *
   *
Gregory J. Bush; Lawrence P. Bush;    *
Joseph D. Bush; Barbara S. Johnson;    *
Thomas M. Bush; Peter A. Bush;    *
Mary P. Walsh; Francis P. McCarthy,    *
   *
      Defendants-Appellees.    *

_____

Submitted: March 13, 2008
Filed: August 5, 2008

_____

Before MURPHY, BRIGHT and BENTON, Circuit Judges.

_____

BRIGHT, Circuit Judge.

This lawsuit arises from the sale of a 50% interest in a holding company, Twin City Mineral Corp. ("Twin City"), by Appellants, Peter Dunning and various family members (collectively "Dunning") to the owners of the other 50% interest, Appellees Gregory Bush, Francis McCarthy and others (collectively "Defendants"). Dunning, dissatisfied with the amount he received in connection with the sale of his interest, seeks damages or avoidance of the contract or certain contract terms by asserting the following claims of fraud and other improper conduct against Defendants: fraudulent concealment, affirmative misrepresentation, rescission, breach of fiduciary duty, securities fraud, insider trading, and breach of contract. The district court granted summary judgment in favor of Defendants on all of Dunning's claims. In doing so, the district court also struck the Dunning supplemental report by expert witness, William Allen ("Supplemental Allen Report"). Dunning appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Specifically, we affirm the dismissal of Dunning's common law fraud and securities fraud claims. We, however, reverse the dismissal of the remainder of Dunning's claims. We also reverse the district court's order striking the Supplemental Allen Report by an expert witness.

## I. Facts and Procedural History

We adopt, with minor changes, the statement of facts and procedural history as stated by the district court in its unpublished order and opinion dated July 26, 2007.[1]

> Twin City Mineral Corp. ("Twin City") is a holding company that owned 50 percent of the outstanding membership interests in Superior Minerals Company, L.L.C. ("Superior"), a Colorado limited liability

---

[1]Dunning, et al. v. Bush, et al., No. 3:05-cv-00050-JAJ-RAW (S.D. Ia. July 26, 2007).

company. Plaintiff Peter Dunning started Twin City in 1987 and ran its day-to-day operations until 2002. The directors of Twin City during 2003 were Peter Dunning, David Dunning, Gregory Bush and Francis McCarthy, until the Dunnings resigned as directors in August of 2003. Prior to December 8, 2003, Twin City owned 50 percent of the outstanding membership interests in Superior. Twin City is a Minnesota corporation.

Between June 1991 and August 2003, Aggregate Industries North Central Region, Inc., a subsidiary of Aggregate Industries, Inc. (referred to collectively as "Aggregate"), a publicly traded company headquartered in London, England, owned the remaining 50 percent interest in Superior. Prior to August 8, 2003, plaintiffs owned 50 percent (30,000 shares) of Twin City and defendants (along with Jack Bush and Charlie Burke) owned the other 50 percent (30,000 shares). Each shareholder group had two directors. Certain shareholders were actively involved in business operations.

Twin City's principal business operations were conducted by Superior. Superior was engaged in the business of processing calcium carbonate into products necessary for various manufacturers in the roofing materials, animal feed, plastic and other industries in the upper Midwest and Canada. The calcium carbonate was purchased from Linwood Mining & Materials Corp. ("Linwood"), which was also owned by defendants. Superior also processed steel mill slag into slag cement for various Portland cement companies. Superior had successfully exploited these markets since the early 1990s. During the calendar year of 2000, as a result of the economic downturn it[sic] the United States economy, the financial results of Superior began to deteriorate and Superior did not earn profits during 2001 and 2002. Superior's losses in 2001 and 2002 were also due in part to a joint venture between Superior and Lehigh, which resulted in significant losses to Superior. Consequentially, the economic circumstances of Twin City deteriorated as well. Further, Superior's banking arrangement was tenuous during the last half of 2002 and first part of 2003. Significant capital contributions to Superior were required from Peter Dunning, defendants and Aggregate in order for Superior to maintain its banking relationship with

U.S. Bank during 2002 and 2003. Peter Dunning did not participate in the capital contributions in 2003.

Superior was operated by a management committee having the effective duties and responsibilities of a board of directors. For several years prior to August 2003, the membership of this committee consisted of eight members – four from Twin City and four from Aggregate. Peter Dunning was on the management committee of Superior until the time he signed the Stock Purchase Agreement. However, Peter Dunning attended no meetings of the management committee in 2003. David Dunning attended a management committee meeting on February 19, 2003. Other Twin City members of the Superior management committee were David Dunning, Gregory Bush and Francis McCarthy.

Rather than make these capital contributions, Peter Dunning decided to sell his family's interest in Twin City. Further, Peter Dunning wished to retire from Superior and move to Vail, Colorado. Peter Dunning was also aware that Superior's financing would be coming due in September 2003. Defendant Greg Bush encouraged Peter Dunning to stay in the business and not sell his interest. Defendants offered to sell their interest in Twin City to Peter Dunning. Peter Dunning felt such discussions were not serious and, therefore, the parties began negotiations to sell plaintiffs' interest in Twin City. Dunning's replacement, Don Vry, was hired and trained. Dunning became inactive in the day-to-day management of Superior prior to January 2003.

In January 2003, discussions began between Peter Dunning and representatives of the McCarthy-Bush defendants regarding the potential sale of the plaintiffs' shares of stock in Twin City. Plaintiffs were represented in the negotiations by attorney Michael Giudicessi of the Faegre & Benson law firm, who negotiated the terms and conditions of the Stock Purchase Agreement on plaintiffs' behalf. Defendants were represented by attorney James Mezvinsky. Eventually, the parties entered into a Stock Purchase Agreement, under which plaintiffs sold their interest in Twin City. Peter Dunning reviewed the entire Stock Purchase Agreement with his attorney before he signed it, and was not aware of anything that was left out of the Agreement that he requested

-4-

his attorney to include. The Stock Purchase Agreement was specifically tailored to the particular transaction between the parties.

The Stock Purchase Agreement contains an integration clause that states that it "constitutes the entire agreement among the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings among them with respect to such matters." The clause continues, "[n]o representation, warranty, promise or understanding shall be binding against a party unless set forth herein."

During a telephone conference on or about July 29, 2003, between and among Peter Dunning, Greg Bush, Frank McCarthy and their respective attorneys, a general discussion of the business affairs and contract provisions of the Stock Purchase Agreement took place. Subsequently, Section 1.4 of the Stock Purchase Agreement was first mentioned around the end of July 2003, and was first drafted by defendants' attorneys on July 30, 2003. Peter Dunning discussed Section 1.4 of the Stock Purchase Agreement with his attorney and read the Stock Purchase Agreement before he signed it. Section 1.4 was discussed and included in the Stock Purchase Agreement as a result of Peter Dunning's desire to protect his earning stream in the event that defendants or one of their companies purchased Aggregate's interest in Superior.

At about this same time, representatives of Aggregate were negotiating a resolution of the Superior/Lehigh joint venture. By July 20, 2003, Aggregate had notified the defendants of the essential terms of a potential resolution whereby Lehigh would cancel Superior's debt. Lehigh would retain assets used in the joint venture, Superior would receive 5,500 tons of cement per year for five years, and Aggregate would receive a guaranteed supply of cement at market price for a term of years. Peter Dunning knew that a resolution was being negotiated and that Superior's relationship with Lehigh was affecting Superior's financial position in a negative fashion. Defendants did not disclose the status of the negotiations between Aggregate and Lehigh to Peter Dunning and Dunning did not inquire further about it. Negotiations continued throughout the fall of 2003 and were finalized in a settlement

agreement dated November 17, 2003. The cement due to Superior under the agreement was assigned to Aggregate as part of Superior's redemption of Aggregate's stock in Superior. Using GAAP, Aggregate valued the cement at $1,582,767. Superior purchased Aggregate's interest in Superior by way of a redemption on December 8, 2003. The Superior Redemption Agreement defined Superior as the "Buyer" and Aggregate as the "Seller" and provides that Aggregate "wishes to sell" its interest in Superior.

Section 1.1 of the Superior Redemption Agreement states:

1.1  Redemption and Sale of Interests. Upon the terms and conditions, for the consideration specified in Section 1.2 below, and subject to the conditions of this Agreement, Buyer agrees to purchase from the Seller, and Seller agrees to sell, transfer, convey and deliver to the Buyer, or its nominee, all of the Interests, which as of the Closing Date shall be free and clear of all liens or encumbrances of any nature.

Section 1.2 of the Superior Redemption Agreement states:

1.2  Purchase Price. The total consideration for the Interests shall be Nine Hundred Fifty Thousand Dollars ($950,000), plus assignment of the Cement Supply Agreement dated September 15, 2003 ("Cement Supply Agreement") attached hereto as Exhibit 1.2. The money portion of the Purchase Price for the Interests shall be payable at Closing, as herein defined, by wire transfer or in certified funds.

One week after the plaintiffs signed the Stock Purchase Agreement and before closing, defendant Frank McCarthy told U.S. Bank that Superior intended to pay off its loans and terminate its relationship with U.S. Bank. Superior's loan application with its new lender, THE National Bank, was prepared on August 26, 2003, approved on September 11, 2003, and closed on September 15, 2003.

The common stock of Twin City owned by the plaintiffs were securities within the meaning of Section 502.102(19) of the Iowa Securities Act. The purchase of the plaintiffs' stock by the defendants was consummated in the state of Iowa.

Defendants notified Peter Dunning of the transaction between Aggregate and Superior shortly after it was complete, and defendants claimed that this transaction triggered Section 1.4 of the Stock Purchase Agreement. Based upon this, plaintiffs' shares would be re-priced at approximately $1,266,000. Aggregate valued the Free Cement Contract at $2,346,000 using accounting standards used in the United Kingdom, which do not require that the value be discounted to a present value.[2]

Dunning, learning of the low value paid to Aggregate by Superior's redemption of Aggregate's stock and contesting that section 1.4 of the Stock Purchase Agreement ("SPA") applied to that transaction, filed this action claiming fraud and breach of contract on the part of Defendants. Specifically, Dunning makes the following claims: one claim of fraudulent misrepresentation and three claims of fraudulent concealment (Count I); equitable rescission based on the fraudulent misrepresentation (Count II); breach of fiduciary duty (Count III); and violation of Iowa Securities Statutes (Counts IV and V). In the alternative, Dunning asserts claims for breach of contract, alleging entitlement to additional money as part of the contract of sale of Dunning's 50% interest in Twin City (Counts VI and VII).

_____

[2]Other facts are related in this opinion.

As damages, Dunning claims that Defendants failed to make payments due to him under section 1.2 of the SPA, which provides for a fixed payment of $1,110,000 and a performance payment equal to 10% of Superior's annual gross profits for ten years following the execution of the SPA.[3] Defendants claim that Dunning was no longer entitled to payment under section 1.2 of the SPA because the Aggregate redemption triggered section 1.4 of the SPA.[4] And therefore under section 1.4, Dunning was only entitled to a lump sum equal to an amount as calculated under section 1.3 of the SPA. As a result, Dunning received substantially less for his shares in Twin City than he expected under the SPA.

The district court granted summary judgment in favor of Defendants on all of Dunning's claims. In granting summary judgment on Dunning's breach of contract claim, the district court also struck the Supplemental Allen Report regarding the value

---

[3]The text of section 1.2 as pertinent here reads:

> 1.2 Purchase Price. The total consideration for the Shares shall be One Million One Hundred Ten Thousand Dollars ($1,110,000) ("Fixed Payment"), plus: an amount calculated based on 10% of Superior's annual gross profits (calculated as set forth in Section 1.2(b) below) for the 10-year period from Closing until December 31, 2012, subject to any adjustment set forth in Sections 1.3 or 1.4 below (if applicable).

[4]The text of section 1.4 as pertinent reads:

> 1.4 Purchase of Aggregate Industries Shares. In the event, prior to December 31, 2012, Buyers or a related or affiliated entity, purchase substantially all of the shares in Superior owned by Aggregate Industries or an affiliate of Aggregate Industries, the purchase price per share hereunder shall be recalculated in a manner similar to the method set forth in Section 1.3 hereunder. Such share price shall supercede and be in lieu of the Fixed Payment and Performance Payment ("New Share Price").

of a Cement Supply Agreement Superior assigned to Aggregate.  This appeal followed.

On appeal, Dunning asserts the following issues:

1.  Did the district court err by granting summary judgment:

    A.  On plaintiffs' claims regarding fraudulent concealment?
    B.  On plaintiffs' claim of affirmative misrepresentation?
    C.  On plaintiffs' rescission claim?
    D.  On plaintiffs' fiduciary duty claim because defendants breached no fiduciary duties?
    E.  On plaintiffs' securities fraud claims?
    F.  On plaintiffs' breach of contract claim?
    G.  On plaintiffs' second breach of contract claim by failing to consider damage evidence?

2.  Did the district court abuse its discretion by striking the second report of plaintiffs' expert witness?

We address each issue.

## II.  Standard of Review

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party.  See R.D. Offutt Co. v. Lexington Ins. Co., 494 F.3d 668, 672 (8th Cir. 2007).  We review the district court's order to strike an expert witness's supplemental report for abuse of discretion.  See Heartland Bank v. Heartland Home Finance, Inc., 335 F.3d 810, 815 (8th Cir. 2003).

### III. Common Law Fraud – Counts I and II

The district court summarized Dunning's fraud claims as follows:

> Plaintiffs [Dunning] make one claim of fraudulent misrepresentation and three claims of fraudulent concealment. First, plaintiffs allege that defendant Greg Bush fraudulently misrepresented to the plaintiffs that Aggregate would not sell its interest in Superior to Twin City for less than five million dollars. Second, plaintiffs assert that the defendants concealed the fact that they had commenced negotiations to purchase Aggregate's interest in Superior prior to the time plaintiffs sold their stock in Twin City. Third, plaintiffs assert that defendants fraudulently concealed their knowledge of the essential terms of the settlement between Superior and Lehigh. Fourth, plaintiffs assert that defendants fraudulently concealed information that Aggregate had withdrawn its financial support and that refinancing was necessary.

Although the district court discussed other aspects of the fraud claims, the key to its rulings denying the several claims of fraud rests on a record, which is absent of evidence that Gregory Bush, representing all Defendants, intended to deceive the Plaintiff Peter B. Dunning, representing all Plaintiffs, in the making of the contract to purchase the Dunning stock (50%) in Twin City.

Although in its brief Dunning refers to other false statements and failures to disclose matters relating to Lehigh and discussions of the purchase of Aggregate's interest in Superior, none of that evidence shows the scienter, intent to deceive, necessary to support the fraud claims against Defendants Bush-McCarthy. Thus, we affirm on the rejection of all the fraud claims including rescission of the contract based on fraud (Counts I and II) and the securities fraud claim (Count IV) based on the Iowa Uniform Securities Act.

We turn to other issues where we reverse.

## IV. Fiduciary Duty – Count III

Dunning's fiduciary duty claim rests upon essentially the same allegations underlying his fraud claims. Dunning claims that a fiduciary relationship existed between himself and Defendants requiring Defendants to disclose (1) their discussion relating to a buyout from Aggregate; (2) the status of the Lehigh settlement; and (3) developments regarding the state of Superior's financing, including its favorable financing arrangements with U.S. Bank.

Dunning also asserts that Defendant Gregory Bush made misleading statements to him regarding Aggregate's desire to sell its interest in Superior. According to Dunning, Bush told him that Aggregate would not sell its interest cheaply, and not for less than $5,000,000. Dunning also claims that Bush told him to "trust me" when negotiating section 1.4.[5]

Pursuant to section 1.4, if Defendants acquired Aggregate's interest in Superior at a low figure, Dunning would get less than if no such acquisition had been made. If the acquisition price was high, on the other hand, Dunning might receive more than or equal to the total purchase price stated in section 1.2 of the SPA. Dunning claims that full disclosure was required from Defendants, who occupied a fiduciary position in the proposed purchase of Dunning's stock in Twin City. According to Dunning, Defendants breached their fiduciary duty by failing to disclose the status of the Lehigh settlement, Superior's bank financing prior to executing the SPA, and, more importantly, Defendants withheld information about discussions with Aggregate preliminary to the buyout of Aggregate's interest in Superior.

---

[5]These statements and failure to disclose could be of importance in Dunning's acceptance of the so-called "up and down" provision (section 1.4) proposed by Defendants at a late date, to which Dunning agreed.

The district court found that the Defendants owed Dunning a fiduciary duty but did not breach it because Aggregate and the Defendants had not yet entered into actual negotiations by the time that Dunning executed the SPA. This analysis misstates the issue. The question is whether the Defendants breached their fiduciary duty to Dunning by failing to disclose their initial discussions with Aggregate. The Defendants do not answer this argument in their brief.

Fiduciary duties of directors and shareholders are governed by the state of incorporation, in this case Minnesota (Twin City is a Minnesota corporation). Potter v. Pohlad, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997). Minnesota law recognizes that shareholders of closely held corporations, such as one comparable to Twin City, owe fiduciary duties to each other. Gunderson v. Alliance of Computer Prof'ls, Inc., 628 N.W.2d 173, 185-86 (Minn. Ct. App. 2001); Berreman v. West Publ'g Co., 615 N.W. 2d 362, 367 (Minn. Ct. App. 2000). Minnesota courts have required that shareholders of a closely held corporation have a duty to deal "'openly, honestly, and fairly with other shareholders.'" Berreman, 615 N.W.2d at 371 (quoting Pedro v. Pedro, 489 N.W.2d 798, 801 (Minn. Ct. App. 1992)). The fiduciary duties of a shareholder in a closely held corporation also include "the duty to disclose material information about the corporation." Id.; Gunderson, 628 N.W.2d at 186 ("Likewise, close-corporation shareholders owe each other a duty of loyalty, which encompasses an obligation to act with complete candor in their negotiations with each other."). This duty "does not extend to obvious matters." Gunderson, 628 N.W.2d at 188. Fiduciaries also may not usurp business opportunities for their own benefit. Triple Five of Minn., Inc. v. Simon, 404 F.3d 1088, 1096-97 (8th Cir. 2005) (citing Miller v. Miller, 222 N.W.2d 71, 78 (Minn. 1974)). In addition, directors of a closely held corporation owe fiduciary duties to individual shareholders. See Regan v. Natural Res. Group, Inc., 345 F. Supp. 2d 1000, 1011-12 (D. Minn. 2004). It is clear that Defendants, as both directors and shareholders of Twin City, a close corporation, owed a fiduciary duty to Dunning, who was also a shareholder and director of Twin City.

Initially, we note that the duty of a fiduciary does not require the intent to deceive necessary to prevail under a fraud theory. In rejecting Dunning's fiduciary duty claim, the district court concluded that matters relating to Defendants' discussions with Aggregate for the sale of Aggregate's interest in Superior, never disclosed to Dunning, were not material. In addition, the district court concluded that Dunning received notice of other matters, which Dunning claims the Defendants also failed to disclose.

These conclusions, however, are not supported by the record. Indeed, the record indicates that during much of 2003, Dunning was no longer actively engaged in Twin City's and Superior's businesses. Therefore, the question of materiality and obviousness of the information not disclosed to Dunning remains a disputed issue of fact. Accordingly, we reverse the district court's entry of summary judgment on Dunning's fiduciary duty claim.

## V. Securities Fraud and Insider Trading – Counts IV and V

Dunning bases his securities fraud claim, Count IV, on Iowa's Uniform Securities Act and relies on the same factual allegations underlying his common law fraud claims set out in Counts I and II. The elements needed to prevail on an action for securities fraud under Iowa Code § 502.401 (Iowa's counterpart to Rule 10b-5) are essentially the same as those required to prevail on a fraud claim. As discussed above, Dunning's fraud claims fail as a matter of law. Accordingly, the district court properly granted summary judgment in favor of Defendants on Count IV.

Dunning's insider trading claim, however, is based on Iowa Code § 502.402.[6] Dunning claims that summary judgment was not proper because Defendants never

---

[6]This provision was amended in 2004 and now governs agent registration. Neither party cites to the current provision governing insider trading.

addressed the issue in their briefs below. Defendants respond that they specifically moved for summary judgment on this count.

Section 502.402 provides:

It is unlawful for any person who is or was an officer, director or affiliate of an issuer whose relationship to the issuer or to any of the foregoing persons gives or gave such person access, directly or indirectly, to material information which is of decisive importance about the issuer or the security not generally available to the public, to purchase or sell any security of the issuer in this state at a time when that person knows such information about issuer or the security gained from such relationship, which information:

1.  Would significantly affect the market price of that security;

2.  Is not generally available to the public;

3.  Such person knows is not intended to be so available, unless that person has reason to believe that the other party to such transaction is also in possession of such information.

Dunning contends, and Defendants do not disagree, that Defendants, as directors of Twin City, are covered by this provision. Dunning asserts that Defendants knew of the Lehigh settlement, knew of Aggregate's decision to stop capital contributions on behalf of Superior, and knew that Aggregate intended to exit Superior. According to Dunning, Defendants should have communicated this information to him because such information materially affected the value of Dunning's stock in Twin City. Furthermore, Dunning claims that Defendants withheld this information from Dunning and the public when Dunning sold his shares in Twin City to Defendants.

-14-

The district court premised its grant of summary judgment on the basis that Dunning was aware that (1) a resolution of the Lehigh dispute was being negotiated, (2) Superior had a September 2003 refinancing deadline, and (3) Aggregate was interested in selling its interest in Superior. While the record shows that Dunning was aware that talks about the Lehigh dispute were in progress, the record provides no support for the district court's other factual findings. The record lacks evidence that Dunning knew about Aggregate's decision to stop capital contributions. Indeed, only Defendants were aware that Aggregate had decided to stop making capital contributions. Also, the record lacks evidence to support the finding that Dunning knew Aggregate was interested in selling its stake in Superior; all the evidence is to the contrary.

In any event, the inferences of knowledge regarding these matters and their materiality are in dispute. Accordingly, we reverse the district court's grant of summary judgment with respect to Dunning's insider trading claim, Count V.

## VI. Breach of Contract– Count VI

Dunning asserts that section 1.4 of the SPA does not apply to Superior's redemption of Aggregate's stock (50%), in which Twin City became sole owner of Superior. By Defendants owning all stock in Twin City, Defendants indirectly could be considered owners of Superior.[7]

---

[7]We reiterate the pertinent provisions of section 1.4:

In the event, . . . Buyers [Defendants] <u>or a related or affiliated entity, purchase substantially all of the shares in Superior owned by Aggregate Industries,</u> . . . the purchase price per share hereunder shall be recalculated . . . Such share price shall supercede and be in lieu of the Fixed Payment and Performance Payment ("New Share Price") (emphasis added).

In addressing Dunning's breach of contract claim with respect to section 1.4 of the SPA, the district court stated:

> Twin City is undeniably a 'related or affiliated entity' of Superior. Twin City purchased Aggregate's interest in Superior in exchange for $950,000 cash, plus the assignment of the Lehigh free cement contract, and other consideration. Thus, the provision for recalculating 'The New Share Price' was triggered and became effective. Unfortunately for plaintiffs, it decreased the amount due them under the Stock Purchase Agreement.

This statement is incorrect. The buyout of Aggregate included a redemption of Aggregate's stock in Superior and additional consideration, but not a "purchase" by Twin City.

The question then becomes whether the actual transaction, a redemption by Superior of Aggregate's stock in Superior, satisfied the contract language that Superior had become a "related or affiliated entity" of the Buyers, within the meaning of section 1.4. Here, Defendants did not directly own any part of Superior. They only possessed an indirect interest in Superior by their ownership of Twin City. Until Defendants bought out Dunning's interest in Twin City, Defendants owned only 50% of Twin City and thus only 25% of Superior.

Section 1.4, read in light of actual developments, is ambiguous. Therefore, we reverse the district court's entry of summary judgment on the breach of contract claim set forth in Count VI. On remand, the parties should have the opportunity to present extrinsic evidence to explain the intent and reach of this provision.

## VII.  Breach of Contract–Count VII–Sanction, Expert Opinion Disallowed

-16-

In connection with Dunning's second contract claim asserting that Defendants breached the SPA by undervaluing the Superior Redemption Agreement, Count VII, the district court also struck the Supplemental Allen Report regarding the value of the Cement Supply Agreement Superior assigned to Aggregate. Specifically, Dunning takes issue with the $1,582,767 value placed on the free cement component of the Superior Redemption Agreement. On May 18, 2007, for the first time, Dunning's expert valued the free cement at $2,300,000, which Dunning argues is consistent with Aggregate's valuation and materially exceeds Defendants' valuation.

The district court struck the report because: (1) it was not a supplemental report within the meaning of Federal Rule of Civil Procedure 26(e); (2) Dunning's claim that Allen could not formulate an opinion on the value of the Cement Supply Agreement without discovery from Aggregate was untenable because "[t]he [district] court . . . believe[d] that there [we]re ample experts and independent sources of information that would have told [Dunning] what 5,500 tons of cement was worth in 2003"; and (3) Defendants would be prejudiced by Dunning's attempt to "interject[] a brand new, previously undisclosed opinion" less than three months before trial and one month after Defendants moved for summary judgment.

Dunning argues that the district court abused its discretion by striking the Supplemental Allen Report because it was a timely filed supplement to Allen's initial report. And even if it was not a timely filed supplemental report, it should have been accepted as an untimely disclosure because its introduction did not prejudice Defendants and was essential to one of Dunning's contract claims. Based on the record, we reverse the sanction disallowing the Supplemental Allen Report.

Allen's initial report only stated that the value of the Cement Supply Agreement was undervalued due to an excessive discount rate and the failure to reflect cement price increases. His report noted, however, that a precise value for the Cement Supply

Agreement would be determined when more information was available (Defendants had not included price information in their valuation schedule).

The record shows that the necessary information came from an Aggregate employee following his May 3, 2007 deposition. Allen thereafter valued the Cement Supply Agreement at $2.3 million in a report dated May 18, 2007, which Dunning produced to Defendants before the close of discovery and three months prior to scheduled trial but a month after Defendants moved for summary judgment.

In rejecting the district court's decision to strike the Supplemental Allen Report, we note first that the district court's observation that the report's lateness was "prejudicial to defendants" lacks factual support in the record. Second, the district court's action resulted in a dismissal of one of Dunning's contract claims. Finally, a dismissal sanction is not warranted, except in cases of egregious conduct. And such conduct was absent here.

The district court should have considered a lesser sanction, if any, before imposing one that resulted in the dismissal of a claim. See Heartland Bank v. Heartland Home Finance, Inc., 335 F.3d 810, 817 (8th Cir. 2003). Here, Defendants do not and cannot claim any surprise or real prejudice from Allen's later detailed report regarding cement valuation.

If the district court's observation that there are "ample experts and independent sources of information that would have told the plaintiffs [or anyone else] what 5,500 tons of cement was worth in 2003 without the need for discovery from Aggregate[,]" then clearly Defendants suffered no prejudice. Those Defendants would be able to verify or challenge Allen's opinion with ease.

In sum, the sanction of dismissal of Count VII is reversed. Obviously, in light of this reversal, Defendants will in no way suffer prejudice from the disclosure of the

May 18, 2007 Allen report. On remand, the Supplemental Allen Report may be admitted into evidence with proper identification.[8]

## VIII. Conclusion

We affirm dismissal of all fraud claims (Counts I, II and IV), but reverse and reinstate counts for breach of fiduciary duty (Count III), violation of Iowa's insider trading statute (Count V), and breach of contract claims (Counts VI and VII).

Accordingly, we remand these claims for further proceedings consistent with this opinion.

_____

---

[8]Whether or not there may be a lesser sanction relating to the timing of the Supplemental Allen Report is a matter for the district court on remand.