BYE, Circuit Judge,
dissenting.
I respectfully dissent. The Court today invalidates provisions of the Minnesota Code of Judicial Conduct prohibiting judicial candidates, including sitting judges, from publicly endorsing other candidates for public office and personally soliciting campaign contributions. Broadly speaking, the Court makes two fundamental errors in its analysis. First, the majority consistently undervalues Minnesota’s compelling interest in promoting impartiality and the appearance of impartiality in the Minnesota judicial system. Second, the majority misapprehends the extent to which the provisions of the Code of Judicial Conduct at issue today are both necessary and narrowly tailored to Minnesota’s critical interests. In striking down Minnesota’s judicial endorsement and solicitation restrictions, the Court today has unnecessarily weakened our courts — and ultimately, I fear, weakened our democracy.
I
As a preliminary matter, I disagree with the majority’s conclusion that appellant Gregory Wersal’s challenge to Rule 4.1(A)(4) of the Minnesota Code of Judicial Conduct (Code) is ripe for disposition. “Ripeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the operation of the challenged [action], and that the injury would be redressed by the relief requested.” Employers Ass’n, Inc. v. United Steelworkers, 32 F.3d 1297, 1299 (8th Cir.1994).
At the district court, Wersal argued Rule 4.1(A)(4), which, in part, bars a judicial candidate from “soliciting] funds for a political organization or a candidate for public office,” prevented him from soliciting funds for his own campaign, because his own campaign is a “political organization” within the meaning of the rule. The district court held that by reading Rule 4.1(A)(4) in context with the surrounding rules, nothing in Rule 4.1(A)(4) prevented Wersal from soliciting funds (as allowed by the remaining rules) for his own campaign committee. Wersal v. Sexton, 607 F.Supp.2d 1012, 1018 (D.Minn.2009).
After the district court ruled, but before we heard this appeal, the Minnesota Supreme Court amended the Code to state that “[f]or purposes of this Code, the term [political organization] does not include a judicial candidate’s campaign committee created as authorized by Rule 4.4.” See Code Terminology Section. Thus, without a colorable argument that his campaign committee qualifies as a political organization, Wersal modified his argument on appeal; Wersal now argues that Rule 4.1(A)(4)’s ban on solicitation for “a candidate for public office” operates to prevent him from soliciting funds for his own campaign. I agree with the majority that Wersal is a candidate for public office under the plain meaning of the phrase, but this point should not end our analysis. While Wersal himself is a candidate for public office, his campaign committee is surely not. As illustrated by Rule 4.4, the campaign committee is an entity separate and distinct from the judicial candidate himself, often serving as a buffer between *843 the judicial candidate and some of the day-to-day campaign activities. For example, Rule 4.4(B)(3) states that “[a] judicial candidate ... shall direct his or her campaign committee ... not to disclose to the candidate the identity of campaign contributors .... ”
To be sure, if Wersal were seeking to solicit contributions and operate his campaign without a campaign committee, then we would have no choice but to confront the constitutionality of Rule 4.1(A)(4). But, as the majority acknowledges, Wersal does not challenge the provisions of the Code involving the use of a campaign committee. Therefore, I would conclude that Wersal’s challenge to Rule 4.1(A)(4) is not ripe. Nothing in the Rule — neither the ban on soliciting funds for “a political organization” nor the ban on soliciting funds for “a candidate for public office” — operates to prevent Wersal from soliciting funds for his campaign committee, which is all Wersal seeks to do. By reaching out to partially invalidate Rule 4.1(A)(4), the majority today unnecessarily strikes down a provision of the Code which is simply not implicated in this case. Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (“[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.”). Because Wersal’s challenge to Rule 4.1(A)(4) is not ripe, I would leave review of Rule 4.1(A)(4) for another day.
II
Although Wersal’s challenge to Rule 4.1(A)(4) is not ripe, the constitutionality of the endorsement clause (Rule 4.1(A)(3)) and the solicitation clause (Rule 4.1(A)(6), 4.2(B)(3)(a)) is squarely before this Court. We review de novo a district court’s grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Dunning v. Bush, 536 F.3d 879, 885 (8th Cir.2008).
A
Because I am in basic agreement with the majority’s identification of the governing constitutional framework, I will not repeat it at length here. In brief, Wersal argues the prohibitions Minnesota has placed on judicial candidates, barring them from endorsing other candidates for public office and from personally soliciting campaign contributions, violate the First Amendment to the United States Constitution. The First Amendment, made applicable to the states, see McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), provides that “Congress shall make no law ... abridging the freedom of speech.... ” U.S. Const, amend. I. Because the Code’s prohibitions on endorsement and solicitation restrict speech by reference to the content of the targeted speech, we must examine the challenged provisions using an analytical framework commonly known as strict scrutiny. Republican Party of Minn. v. White, 536 U.S. 765, 774-75, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (White I). Under the strict scrutiny analysis, the state bears the burden of proving that the challenged provisions are (1) narrowly tailored, to serve (2) a compelling state interest. Id.
B
Like the majority, I begin my analysis with an examination of the interests served by Minnesota’s Code of Judicial Conduct.
*844 Minnesota[14] asserts several interests which it argues are compelling: (1) maintaining judicial impartiality, defined as the lack of bias for or against either party to a proceeding; (2) maintaining the appearance of judicial impartiality; (3) promoting open-mindedness, defined as a willingness to consider views that oppose preconceptions, and remain open to persuasion; (4) preventing candidates from abusing the prestige of office; and (5) protecting the political independence of the judiciary.
As we observed in Republican Party of Minnesota v. White, 416 F.3d 738, 749 (8th Cir.2005) (en banc) (White II), precisely what constitutes a “compelling interest” is not easily defined. The Supreme Court has alternatively described the concept as an: “interest[ ] of the highest order,” “overriding state interest,” “unusually important interest.” Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); McIntyre, 514 U.S. at 347, 115 S.Ct. 1511; Goldman v. Weinberger, 475 U.S. 503, 530, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (O’Connor, J., dissenting). Some cases have found an interest compelling based on policy grounds. For example, courts have recognized compelling interests in apprehending highly mobile criminal suspects, deterring murder, avoiding the harms of illicit drugs, realizing consumer benefits in licensing requirements for professionals, and upholding the administration of justice. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L.Rev. 917, 935 n. 85 (1988) (collecting cases). Other examples of compelling government interests recognized by the Supreme Court include “[pjressing public necessity” during wartime, see Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944), combating terrorism, see Holder v. Humanitarian Law Project, — U.S. -, 130 S.Ct. 2705, 2727-28, — L.Ed.2d - (2010), the need to remedy specific instances of past discrimination, see Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 277, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), attaining “student body diversity” in higher education, see Grutter v. Bollinger, 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), and maintaining “prison security and discipline,” see Johnson v. California, 543 U.S. 499, 512, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). Other cases have found a basis for recognizing a compelling interest in “the realization of constitutional guarantees.” White II, 416 F.3d at 750 (citations omitted).
There is broad agreement that states have a compelling interest in employing judges who are actually impartial. Indeed, due process requires that judges be impartial. See, e.g., Turney v. Ohio, 273 U.S. 510, 512, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Actual impartiality means a judge’s lack of bias for or against either party to a proceeding. White I, 536 U.S. at 775, 122 S.Ct. 2528.
With respect to Minnesota’s asserted interest in promoting the appearance of impartiality, we have thus far provided little — -too little — examination of the subject. During oral argument in this case, I asked Wersal’s counsel whether the state of Minnesota has “a compelling interest here in maintaining the appearance of impartiality set apart from the state’s interest in promoting actual impartiality?” Counsel responded, “Yes, I think they have both.” Notwithstanding the parties’ agreement on the subject, I want to take a moment to *845 explore the meaning and potential importance of Minnesota’s interest in promoting the appearance of impartiality in the state’s judiciary.
Drawing from the “core” definition of impartiality recognized in White I, the appearance of impartiality, as the phrase is used in this dissent, means the perception of a judiciary made up of judges who lack bias for or against a particular party (or parties) to a given proceeding. To be sure, the concepts of actual and perceived impartiality are related, but they are not entirely coextensive. For example, a hypothetical judge who harbors a bias towards Catholics but shows no outward manifestations of her bias lacks impartiality (at least in a case where one party is Catholic), but may not create the appearance of impartiality. Likewise, a judge who uses disrespectful language when addressing criminal defendants will likely be perceived as lacking impartiality, even if the judge lacks an actual bias against any particular party. Cfi Inquiry into Conduct of Blakely, 772 N.W.2d 516, 523-26 (Minn.2009) (per curiam) (discussing the difference between actual and perceived impropriety by a judge, and the appropriate sanction for each necessary “to protect the public by preserving the integrity of the judicial system”); Buckley v. Valeo, 424 U.S. 1, 26-27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (discussing the differences between actual and perceived corruption in our political system). Two features serve to distinguish the concepts of actual impartiality and the appearance of impartiality. First, while the existence of actual impartiality turns on a particular judge’s mental state, the appearance of impartiality springs from the perceptions of people who see, hear, read about, or otherwise interact with one or more judges in the judicial system. Second, while an examination of actual impartiality will use a narrow lens, usually focusing on an individual assessment of one particular judge, an inquiry into the appearance of impartiality will often focus on the aggregate: how the judiciary is perceived by the people it serves.[15]
Turning to the relative importance of maintaining the appearance of impartiality, several sources help illuminate the compelling nature of Minnesota’s interest in fostering the appearance of impartiality. There is no question that maintaining the appearance of impartiality is a central pillar to the Minnesota Code of Judicial Conduct, reflecting the Minnesota Supreme Court’s empirical judgment on the relative importance of maintaining the appearance of impartiality in the state judiciary. The Code states that “[ijnherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system.” Code Preamble. In addition, judges are admonished to “avoid both impropriety and the appearance of impropriety” and “aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence.” Id. The Constitution itself points in the same direction. Our law dictates that a mere appearance of bias, without a showing of actual bias, is sufficient in some circumstances to violate the due process rights of litigants. See Caperton v. AT. Massey *846 Coal Co., Inc., — U.S. -, 129 S.Ct. 2252, 2257, 173 L.Ed.2d 1208 (2009) (holding that a party’s due process rights are violated when “the probability of actual bias on the part of the judge or decision-maker is too high.”). Finally, relevant historical sources evince a long-held view on the importance of maintaining the appearance of impartiality in the judiciary. Writing in support of ratifying the newly-written United States Constitution, Alexander Hamilton wrote:
The benefits of the integrity and moderation of the judiciary have already been felt in more States than one; and though they may have displeased those whose sinister expectations they may have disappointed, they must have commanded the esteem and applause of all the virtuous and disinterested. Considerate men, of every description, ought to prize whatever will tend to beget or fortify that temper in the courts: as no man can be sure that he may not be tomorrow the victim of a spirit of injustice, by which he may be a gainer- to-day. And every man must now feel, that the inevitable tendency of such a spirit is to sap the foundations of public and private confidence, and to introduce in its stead universal distrust and distress.
The Federalist No. 78 (Alexander Hamilton).
The “universal distrust and distress” Hamilton described can take hold in an atmosphere where the public has lost confidence — rightfully or not — in the impartiality of its judiciary. A perception of systemic bias can cause a chilling effect on the exercise of legal rights: parties or. potential parties “may be reluctant to expend time and resources in a judicial system perceptibly stacked against them on account of who they are.” Tobin A. Spar-ling, Keeping Up Appearances: the Constitutionality of the Model Code of Judicial Conduct’s Prohibition of Extrajudicial Speech Creating the Appearance of Bias, 19 Geo. J. Legal Ethics 441, 472 (2006). More broadly, it is not an overstatement to say that public confidence in the judiciary is necessary to a functioning democracy and civil society. One need not look very far beyond our borders to see the consequences where judiciaries — rightfully or not — have lost their reputation for delivering justice. Judicial institutions are replaced by less refined methods of problem solving. Gangs, warlords, militias, and vigilante justice can easily become de facto judges and juries.
For the foregoing reasons, I would conclude, independent of the parties’ agreement, that Minnesota has met its burden of demonstrating a compelling state interest in (1) maintaining actual judicial impartiality and (2) maintaining the appearance of judicial impartiality.[16] Cf. Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 290, 37 S.Ct. 287, 61 L.Ed. 722 (1917) (“[T]he court cannot be controlled by agreement of counsel on a subsidiary question of law.”).
The mere identification of Minnesota’s compelling state interests, however, does not, standing alone, justify the provisions of the Code Wersal challenges. Where a state seeks to protect its interests through content-based speech restrictions, as Minnesota does here, courts must engage in an exacting review, examining the extent to which the challenged provisions are “narrowly tailored” to the identified interests. White I, 536 U.S. at 774-75, 122 S.Ct. 2528. It is to that review I now turn.
*847 c
As we stated in White II, “whether or not a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest.” 416 F.3d at 751.
A narrowly tailored regulation is one that actually advances the state’s interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

Id.

1

I turn first to the endorsement clause. Rule 4.1(A)(3) provides that a judge or judicial candidate shall not “publicly endorse or, except for the judge or candidate’s opponent, publicly oppose another candidate for public office.”
The endorsement clause advances the state’s interest in maintaining actual judicial impartiality and the appearance of impartiality. When a judge or judicial candidate endorses another candidate, the act of endorsement creates a risk that the judge will not be impartial. There is a risk the judge will harbor a bias in favor of the endorsed candidate and those who associate with or support that candidate. Equally important, there is a risk the judge will harbor a bias against other candidates in the same race as the endorsed candidate, and those who associate with or support the candidates who did not receive the endorsement. Even more fundamentally, the act of endorsement directly undercuts the state’s interest in maintaining the appearance or impartiality. By moving past the role of mere participant in the political system to the role of political power broker trading on the currency of his position, a judge who gives political endorsements creates the perception of a judicial branch beholden to political interests. Indeed, in a recent survey of Minnesotans, ninety-one percent thought “the courts are supposed to play a unique role in our democratic system and should be free of political pressures;” only five percent believed “the Minnesota State Courts are just like the Executive and Legislative branches of government and should not be free of political pressures.” See The Minnesota Difference: The Minnesota Court System and the Public (2007), available at http://www.courts.state.mn.us/ documents/0/Public/Court_Information_ Office/MinnesotaN)ourts_Final_Report_ FINAL.doc. By placing political pressures on the endorsing judge, the endorsement effectively erodes the appearance of judicial impartiality.
In addition, the endorsement clause does not sweep too broadly. The majority first attempts to analogize the endorsement clause to the much broader announce clause struck down in White I. But the majority’s analysis on this point is seriously flawed. The Supreme Court held that the announce clause, which stated that a candidate for judicial office shall not “announce his or her views on disputed legal or political issues,” was not narrowly tailored to the state’s interest in maintaining actual impartiality or the appearance of impartiality. White I, 536 U.S. at 770, 122 S.Ct. 2528. The Court reasoned that the announce clause “d[id] not restrict speech for or against particular parties, but rather speech for or against particular issues.” Id. at 776, 122 S.Ct. 2528 (emphasis in original). It seems plain enough that this case presents precisely the opposite scenario: the endorsement clause restricts speech for or against parties, not issues.
*848 The majority attempts to circumvent the clear hurdle presented by White I by positing that the endorsement clause is really just another announce clause in disguise. To illustrate its point, the majority explains that an endorsement of Ronald Reagan for President could convey a judicial candidate’s support for strict interpretation of the Constitution. The majority’s point that speech can and does serve as a proxy for other, underlying ideas is well taken. But, under the lens of strict scrutiny, our focus must remain on the speech that is regulated by reference to its content. See Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). To be sure, the endorsement clause is content-based, because the clause prohibits judicial candidates from expressing the idea of endorsement itself, while leaving unregulated speech on every other subject matter. But the endorsement clause, unlike the announce clause, does not regulate underlying ideas conveyed by the endorsement by reference to their content. With respect to a judicial candidate’s views on strict interpretation of the Constitution, or abortion, or same-sex marriage, or any other idea the judicial candidate wishes to convey, the endorsement clause is entirely content-neutral. The candidate is free to state: “I support (or oppose) a strict interpretation of the Constitution.” The candidate could even say “I support strict interpretation, as articulated by Ronald Reagan.” The only idea the candidate is barred from expressing is the idea of endorsement itself — an idea that does not burden any other ideas or viewpoints on an unequal basis. The announce clause, by contrast, directly regulated a large class of ideas according to their content, forbidding speech on disputed legal or political issues, but leaving unregulated speech on all undisputed issues, as well as disputed issues not of a political or legal nature. See White I, 536 U.S. at 768, 122 S.Ct. 2528.
The majority’s analysis thus effectively renders pointless the idea/party distinction drawn in White I. Under the majority’s analysis, even a speech restriction on statements showing bias against a party to a proceeding would fail strict scrutiny. Following the majority’s reasoning, such a restriction would also necessarily limit the expression of secondary ideas conveyed by the statement of bias. For example, the statement “I am biased against plaintiff Smith” could also theoretically convey a judicial candidate’s view that the court system is overburdened by frivolous lawsuits. If, as the majority suggests, we must take account in our strict scrutiny analysis of all possible secondary meanings of the statement of bias — even those not regulated by reference to their content — then even a ban on speech showing bias towards a party would be overinclusive with respect to a state’s compelling interest in judicial impartiality. This is so because the ban on biased statements would impermissibly limit, according to the majority’s analysis, the judicial candidate from expressing his views on frivolous lawsuits. In contrast to the majority’s incorrect analytical approach, the Supreme Court has consistently confined its strict scrutiny overinclusiveness analysis to speech regulated by its content by the terms of the speech restriction itself. For example, in Simon & Schuster, Inc. v. Members of New York State Crime Victims Board, 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) the Supreme Court struck down a New York law preventing criminals from profiting by selling books describing their crimes. Id. at 123, 112 S.Ct. 501. The Court held the law overinclusive with respect to New York’s compelling interest in preventing criminals from profiting from their crimes, as the law would apply to “such works as *849 the Autobiography of Malcolm X,” Civil Disobedience by Henry David Thoreau, as well as works by Martin Luther King, Jr. Id. at 121, 112 S.Ct. 501. The Court concluded that the law “clearly reaches a wide range of literature that does not enable a criminal to profit from his crime.” Id. at 122,112 S.Ct. 501.
Our focus, therefore, when asking whether the endorsement clause sweeps too broadly, should not extend beyond the ideas regulated by the endorsement clause because of their content. With the proper legal standard in mind, I would conclude the endorsement clause does not sweep too broadly. Because, as previously discussed, every endorsement of a person carries the risk of bias, or the appearance of bias, the endorsement clause targets precisely the speech most likely to implicate Minnesota’s compelling interests.[17]
Nor is the endorsement clause underinclusive. The endorsement clause must be read in concert with Rule 4.1(A)(10) of the Code, which states that “a judge or judicial candidate shall not ... make any statement that would reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court....” By its plain terms, Rule 4.1(A)(10) prevents a judge or judicial candidate from making any statement showing bias for or against any party, in either a pending or impending proceeding, as such a statement would “impair the fairness” of the case. Rule 4.1(A)(10), together with the endorsement clause, ensures that no speech directly bearing on a judicial candidate’s bias towards a party is left unregulated.
The majority attempts to illustrate the endorsement clause’s underinclusiveness by asserting that “a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office.” Ante at 836. But the majority’s assertion is incorrect in two important respects. First, in the vast run of cases, Rule 4.1(A)(10) will prevent a judicial candidate from endorsing a public official. For example, a judicial candidate would be prevented from “endorsing”[18] a lame duck county sheriff or county attorney because doing so would “impair the fairness of a matter pending or impending in any court,” as sheriffs and county attorneys continually appear in court. Second, the majority assumes, wrongly, that a potential recipient of an endorsement is not a “candidate for public office” within the meaning of the endorsement clause until she “officially file[s] for office.” Ante at 836. In the case of judi *850 cial candidates endorsing other judicial candidates, the majority’s assertion is demonstrably false:
A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, authorizes or, where permitted, engages in solicitation or acceptance of contributions or support, or is nominated for election or appointment to office.
Code Terminology Section. Although the Code is silent on precisely when a nonjudicial candidate becomes a “candidate for public office,” I would construe the endorsement clause’s “candidate for public office” language consistently with the Code’s definition of a candidate for judicial office. In other words, a person becomes a candidate for public office when he (1) makes a public announcement of candidacy, (2) files, (3) authorizes or engages in solicitation, or (4) is nominated for office. Such a construction helps alleviate the underinclusiveness identified by the majority. See Edward J. DeBartolo Corp., 485 U.S. at 575, 108 S.Ct. 1392 (avoidance canon of statutory interpretation). In the narrow subset of cases where an “endorsement” of a person would not be barred by either the endorsement clause or Rule 4.1(A)(10), the speech is left unregulated precisely because these cases do not implicate Minnesota’s interests in promoting impartiality or its appearance. Endorsing persons who are not involved in current or impending litigation before any court and who are not running for public office presents little risk of creating actual bias, and does not raise the same quid pro quo and political independence concerns that would lead a reasonable person to perceive a decreased appearance of judicial impartiality.
The majority also finds the endorsement clause underinclusive because, in the majority’s words, “the endorsement clause would permit a candidate to endorse the acts and policies of non-candidates [such as] businesses, labor unions, the ACLU or any public officials not running for office.” But the absence of the hypothetical speech restrictions outlined by the majority cannot be evidence of the endorsement clause’s underinclusiveness because the speech restrictions described by the majority would be unconstitutional. As an illustration, the American Civil Liberties Union lists “free speech” as one of the organization’s “key issues,” stating that “[s]ince 1920, the ACLU has worked to preserve our freedom of speech.” See httpv7www.aclu.org/key-issues. If Minnesota attempted to prohibit judicial candidates from echoing the ACLU and announcing their views that, for example, they “work to preserve our freedom of speech,” it is beyond dispute that the prohibition would violate judicial candidates’ First Amendment rights. See White I, 536 U.S. at 770, 122 S.Ct. 2528. Indeed, the speech restrictions on “acts and policies of non-candidates” suggested by the majority would be woefully overinclusive according to the majority’s own analysis contained just one page earlier in its opinion! I would not require Minnesota to violate the Constitution in order to craft a constitutional endorsement clause.
Finally, I disagree with the majority’s conclusion that recusal would adequately address Minnesota’s interests in maintaining judicial impartiality and the appearance of judicial impartiality. In White II, we relied, in part, on the availability of recusal as a less-restrictive alternative in striking down the prior Code’s partisan activities clause and parts of the solicitation clause. White II, 416 F.3d at 754, 765-66. Implicit in our conclusion in White II was our understanding that recusals would not be so frequent as to seriously disrupt the proper functioning of the *851 judicial system. In contrast to White II, however, recusal is an inadequate remedy in a judicial system where judges and judicial candidates are permitted to endorse each other and other candidates for public office. As the district court observed, recusal is unworkable “when a judge endorses an individual who is elected to a position where he or she is frequently a litigant.” Wersal, 607 F.Supp.2d at 1023. For example, if a district court judge in a rural area endorsed the county sheriff and county attorney for reelection, the judge would be required to recuse himself in almost every criminal case — and few, if any, other judges would be available to take over the case load. Similarly, if an appellate court judge endorsed a slate of district court judges, the appellate court judge would have to recuse himself in every appeal reviewing the judgment of any of the endorsed district court judges. The same is true of a judicial candidate who endorsed prominent political figures in Minnesota, who are frequently parties to judicial proceedings. See, e.g., Coleman v. Franken, 767 N.W.2d 453 (Minn.2009); Brayton v. Pawlenty, 781 N.W.2d 357 (Minn.2010).
In short, a system of open endorsements would create a tangled web of conflicts that could not be solved by recusals. Perhaps more fundamentally, even if judges managed to recuse themselves whenever an endorsee was a party (or witness) to a proceeding, the recusals would do little to change the perception that the judiciary as a whole lacks impartiality. Perceptions of bias would be justified in cases involving not just endorsees, but also their friends, family, associates, supporters, opposing candidates, and their supporters. Some citizens might conclude, reasonably, that the judicial system is simply too compromised by partisan politics, and resolve their disputes through alternative means. Although recusals would undoubtably mitigate bias in some instances, they would not — in a climate of pervasive endorsements by judges and judicial candidates— protect Minnesota’s interests in maintaining impartiality and the appearance of impartiality at even a tolerable level.
For the forgoing reasons, I would conclude that Minnesota has met its heavy burden in demonstrating that the endorsement clause is narrowly tailored to the state’s compelling interests. In so concluding, I would join what was, before today, the unanimous judgment of state and federal courts affirming the constitutionality of judicial endorsement prohibitions. See Siefert v. Alexander, 608 F.3d 974, 983-84 (7th Cir.2010); In re Matter of William A. Vincent, Jr., 143 N.M. 56, 172 P.3d 605, 606, 608-09 (2007) (upholding a judicial canon that prohibited a judge or judicial candidate from “publicly endorsing] or publicly opposing] a candidate for public office through the news media or in campaign literature” finding that the clause was “narrowly tailored to serve the State’s compelling interest in a judiciary that is both impartial in fact and in appearance”); In re Matter of Ira J. Raab, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1292 (2003); Yost v. Stout, No. 06-4122-JAR, slip op. at 12 (D.Kan. Nov. 16, 2008) (upholding endorsement clause because provision “restricts a judge or judicial candidate from publicly endorsing other candidates for public office; it does not restrict speech concerning disputed political issues.”).
2
I turn next to the solicitation clause. Rule 4.1(A)(6) of the Code bars judges and judicial candidates from “personally soliciting] or accepting] campaign contributions other than as authorized by Rules 4.2 and 4.4.” Rule 4.2(B)(3)(a) permits a judge or judicial candidate to “make a general request for campaign contributions *852 when speaking to an audience of 20 or more people.” In addition, Rule 4.2(B)(8)(c) permits a judge or judicial candidate to “personally solicit campaign contributions from members of the judge’s family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority.” However, as previously discussed, the Code does not allow what Wersal seeks to do: personally solicit campaign contributions by walking door-to-door and making phone calls.
As a preliminary matter, I disagree with the majority’s decision to analyze Wersal’s challenge to the Code’s solicitation clause as an as-applied, rather than facial, challenge. In White II, we sustained a facial challenge to the solicitation clause (as then written) despite the fact that the challenge was limited to the clause’s prohibition on soliciting contributions from large groups and using a candidate’s signature on campaign committee literature. White II, 416 F.3d at 765-66. Further, the majority predicates its decision to analyze the solicitation clause as-applied on the alleged fact that Wersal wishes to solicit funds only from non-attorneys. Ante at 838-39. Nowhere in the record does Wersal state, or even imply, that he would limit his solicitation entirely to non-attorneys. On the contrary, Wersal states he wishes to “personally solicit contributions from potential donors both by going door-to-door [and] making personal phone calls.” Wersal does state that he “does not wish to solicit funds from those he knows to be attorneys,” but Wersal would undoubtably encounter persons whom he does not know to be attorneys in the course of his proposed solicitation. Without any suggestion to the contrary from Wersal, it is unreasonable to infer from the facts in the record before us that Wersal only intends to solicit funds from non-attorneys. See Dunning, 536 F.3d at 885 (in reviewing summary judgment orders, appellate court must view the evidence in the light most favorable to the nonmoving party).[19]
Turning to the merits, I would conclude the solicitation clause furthers Minnesota’s compelling interest in maintaining the appearance of judicial impartiality. As Justice O’Connor observed in White I, “the mere possibility that judges’ decisions may be motivated by the desire to repay campaign contributors is likely to undermine the public’s confidence in the judiciary.” White I, 536 U.S. at 790, 122 S.Ct. 2528 (O’Connor, J., concurring). Indeed, “there is no aspect of the electoral system of choosing judges that has drawn more vehement and justifiable criticism than the raising of campaign funds, particularly from lawyers and litigants likely to appear before the court.” Stretton v. Disciplinary Bd. of Supreme Court of Penn., 944 F.2d 137, 145 (3d Cir.1991) (footnote omitted) (upholding prohibition on personal solicitation). And as the Oregon Supreme Court observed:
The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound.... A judge’s direct request for campaign contributions offers a quid pro quo or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, *853 preserves the judiciary’s reputation for integrity.
In re Fadeley, 310 Or. 548, 802 P.2d 31, 40 (1990) (upholding prohibition on personal solicitation of funds).
Whether personal solicitation by judicial candidates impacts the appearance of impartiality is an empirical question. Cf. Holder v. Humanitarian Lato Project, — U.S. -, 130 S.Ct. 2705, 2724, — L.Ed.2d - (2010) (“Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question.”). Recent polls found that seventy percent of the public thinks raising money for their elections affects judges’ rulings to a moderate or great extent. Kathleen Hall Jamieson and Michael Hennessy, Public Understanding and Support for the Courts: Survey Results, 95 Geo. L.J. 899, 901 (2007). According to a 2002 written survey, forty-eight percent of state supreme court judges believe that campaign contributions to judges have “a great deal” or “some” influence on judges’ decisions. Greenberg Quinlan Rosner Research & American Viewpoint, Justice At Stake State Judges Frequency Questionnaire, Q. 12 at 5 (2002). Turning the focus to Minnesota, a 2008 poll found that fifty-nine percent of Minnesotans said that contributions have “a great deal” or “some” influence on judges. Decision Resources Ltd., Justice at Stake Study, Minnesota Statewide, Q. 35 (January 2008). And forty-nine percent of Minnesotans thought that “individuals or groups who give money to judicial candidates in Minnesota get favorable treatment.” See The Minnesota Difference: The Minnesota Court System and the Public (2007), available at http:// www.courts.state.mn.us/documents/O/ Public/Court_Information_Office/ Minnesota_Courts_Final_Report_FINAL. doc.
The majority skips past this data and finds the solicitation clause overinclusive because the risk of bias “comes not in the mere solicitation — the ‘ask’ — but rather in the resulting contribution.” Ante at 840. I disagree. At the outset, the majority’s statement runs counter to our statement in White II that “[kjeeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality....” 416 F.3d at 765. Additionally, when a judge or judicial candidate asks for money, one-on-one, the potential donor is presented with an unseemly choice: contribute, and perpetuate the appearance of impartiality, or decline to contribute, and risk retribution. As the Supreme Judicial Court of Maine stated:
It is exactly this activity that potentially creates a bias, or at least the appearance of bias, for or against a party to a proceeding. If a contribution is made, a judge might subsequently be accused of favoring the contributor in court. If a contribution is declined, a judge might be accused of punishing a contributor in court.
In re Dunleavy, 838 A.2d 338, 351 (Me. 2003). Contrary to the majority’s assertion, it is precisely the act of asking for money one-on-one that creates the appearance of impartiality. And no matter what course of action the potential donor chooses, the appearance of judicial impartiality is diminished. As the Seventh Circuit aptly stated, “[a] direct solicitation closely links the quid — avoiding the judge’s future disfavor — to the quo — -the contribution.” Siefert, 608 F.3d at 989.
Such a result inheres in the Supreme Court’s decision in McConnell v. Federal Election Commission, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), overruled in part on other grounds, Citizens *854 United v. FEC, — U.S. -, 130 S.Ct. 876, 886, — L.Ed.2d - (2010). There, the Supreme Court upheld against a First Amendment challenge a provision of the Bipartisan Campaign Reform Act of 2002 prohibiting (with limited exceptions) federal candidates and officeholders from soliciting soft money contributions. Id. at 183-84, 124 S.Ct. 619; id. at 314, 124 S.Ct. 619 (Kennedy, J., concurring). Directly contrary to what the court holds today, the Supreme Court stated that “soft-money donations at a candidate’s or officeholder’s behest give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder,” and “the value of the donation to the candidate or officeholder is evident from the fact of the solicitation itself.” Id. at 182, 124 S.Ct. 619 (emphasis added). See also Siefert, 608 F.3d at 990.
I also disagree with the majority’s assertion that less restrictive means exist to protect Minnesota’s compelling interests. In Minnesota, judicial candidates are required to “take reasonable measures to ensure that the candidate will not obtain any information identifying those who contribute or refuse to contribute to the candidate’s campaign.” Code Rule 4.2(A)(5). Although the rule banning judicial candidates from learning the identity of donors certainly helps maintain the appearance of impartiality, the efficacy of the rule is greatly undermined without an operative solicitation clause. As anyone familiar with retail politics can attest, potential donors will often interrupt the pitch for money with an answer, or a door in the face. In other cases, verbal cues and body language by the potential donor will leave the judicial candidate with a strong impression of the potential donor’s likelihood of making a contribution. Thus, the act of solicitation itself will, in many cases, significantly undermine Minnesota’s goal of preventing the judicial candidate from learning the identity of those who contribute or refuse to contribute.
Neither is recusal an adequate alternative to the solicitation clause. The recent Caperton case illustrates why. In Caper-ton, a West Virginia jury returned a verdict that found the defendants, A.T. Massey Coal Co. and its affiliates, liable for $50 million in damages. Caperton 129 S.Ct. at 2257 (2009). While the coal company’s appeal was pending, Don Blankenship, Massey’s chairman and chief executive officer spent over $2.5 million in support of a candidate running against an incumbent for a seat on the Supreme Court of Appeals of West Virginia. Id. The candidate, Brent Benjamin, won the election. Id. Later, when Massey’s appeal was heard by the Supreme Court of Appeals of West Virginia, then-Justice Benjamin refused to recuse himself and cast the deciding vote in the court’s decision reversing the $50 million verdict. Id. at 2257-58. The United States Supreme Court ultimately held that the Due Process Clause required Justice Benjamin to recuse himself. Id. at 2265. I cite Caperton not for its legal holding, but rather as a cautionary tale illustrating two points. First, judges whose contributions give rise to the appearance of partiality may be reluctant to recuse themselves. Second, and most fundamentally, by the time a case rises to the level of egregiousness where the Due Process Clause, by its own force, requires recusal, the judiciary’s appearance of impartiality has already been severely undermined. I would not force Minnesota to follow West Virginia’s path. The state’s interest in maintaining the appearance of impartiality in its judiciary goes far beyond protecting the absolute baseline of fundamental fairness required by due process. Having recognized Minnesota’s interest in maintaining the *855 appearance of impartiality as compelling, I would conclude that the solicitation clause is narrowly tailored to serve this interest.
I would conclude, therefore, that the solicitation clause does not violate the First Amendment.[20]
Ill
Although not essential to the legal conclusions I reach today, I wish to comment briefly on the development of our caselaw in this area.
Underlying today’s decision, as well as our prior decisions, are somewhat competing philosophies with respect to judicial elections. These differences were most evident in White I. In White I’s majority opinion, written by Justice Scalia, the Court made clear that judicial elections should be played out under the same rules as any other election for public office. By contrast, Justice Ginsburg, in her dissenting opinion, presented a competing philosophy, which would “differentiate elections for political offices, in which the First Amendment holds full sway, from elections designed to select those whose office it is to administer justice without respect to persons.” White I, 536 U.S. at 805, 122 S.Ct. 2528 (Ginsburg, J. dissenting). Although White I may not have provided the final word on the larger philosophical debate, it did provide us with the appropriate framework for deciding constitutional challenges arising in the context of judicial elections. Once the Court made the threshold choice to apply the strict scrutiny framework to speech restrictions governing judicial elections, the result in White I was clear: the suppression of views on disputed legal and political issues is, as the Court noted, only tenuously related to any interest in maintaining an impartial judiciary.
White II was this court’s first opportunity to apply the strict scrutiny framework announced in White I to a relatively more difficult set of provisions in the Minnesota Code of Judicial Conduct. I joined this court’s opinion in White II because I concluded that Minnesota’s ban on partisan activities and solicitation from large groups, although perhaps important, were not essential to the state’s interests in maintaining judicial impartiality or its appearance.
In parting ways with the court today, I note my increasing discomfort with the court’s analytical approach. As I see it, the court’s analysis, at the most basic level, amounts to an examination of whether a given speech restriction placed on judges is essential — in every case — to fully realize the protections of due process. Without prejudicing the outcome of future challenges, no speech restriction, whether it is imposed on judicial candidates or simply judges, is essential to due process in every case. The majority’s approach, in my view, significantly discounts the role states play in maintaining a judicial system that serves its people with a higher standard of fairness and impartiality. Although the Constitution guarantees a minimum standard of fundamental fairness, Minnesota has endeavored to hold itself to a higher standard. Implicit in the majority’s opinion is the notion that any effort to maintain judicial impartiality or its appearance beyond what the Constitution requires is nonessential and expendable. To be sure, White I counsels us to review restrictions on speech with exacting scrutiny. But where a state has crafted its restrictions *856 carefully to maintain a fair and impartial judiciary, in both practice and appearance, as Minnesota has done here, the First Amendment must yield.
IV
For the foregoing reasons, I respectfully dissent.

. Wersal sued every member of the Minnesota Board of Judicial Standards and Minnesota Lawyers Professional Responsibility Board in his or her official capacity. For ease of reading, I will refer to the defendants — appellees here — in this case as "Minnesota.”

. In this sense, the interest in maintaining the appearance of judicial impartiality is a close cousin to the "weighty interest[j" in preventing the "appearance of corruption,” which the Supreme Court described in Buckley as "stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.” Buckley, 424 U.S. at 27, 29, 96 S.Ct. 612.

. Because I ultimately conclude that the provisions of the Code challenged in this litigation are narrowly tailored to these two interests, I need not confront today whether the remaining interests proffered by Minnesota are compelling.

. The majority finds fault with the endorsement clause for the independent reason that not all persons who receive endorsements will become parties in Minnesota courts. The majority’s reasoning misses the mark in three respects. First, any candidate for public office could become a party to a proceeding in Minnesota, and it is impossible to determine beforehand who will appear in court as a party and with what frequency. More importantly, the majority makes the faulty assumption that a judge who makes an endorsement would only potentially be biased in favor of the recipient of the endorsement herself. As previously discussed, such bias could easily extend to the endorsee's supporters and associates, as well as other candidates who did not receive the judicial candidate’s endorsement, along with their friends and supporters. Therefore, the risk of actual bias is much greater than the majority lets on, even in cases where the endorsed candidate never appears as a party in court before the judicial candidate. Finally, the majority, as it does throughout its opinion, ignores the extent to which each and every endorsement creates the appearance of bias irrespective of whether the endorsed candidate ever appears in court.

. Obviously the concept of endorsement here would mean something different than an endorsement for office, as the public official, by hypothesis, is not a candidate for public office.

. Wersal does state once in his brief that he wishes to personally solicit campaign contributions only from non-attorneys. App. Br. at 55. It is axiomatic, however, that appellate courts will "not take[] into consideration matters included in the [a party's] brief which were not before the trial court and are no[t] part of the record on appeal.” Nelson v. Swing-A-Way Mfg. Co., 266 F.2d 184, 189 (8th Cir.1959).

. Although I concluded that Wersal's challenge to Rule 4.1(A)(4) was not ripe, the majority reached the issue. If required to confront the merits, I would similarly uphold Rule 4.1(A)(4) for the same reasons I would sustain the solicitaiion clause.